UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

00 OCT -3 PM 3: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

ELLEN HENDERSON,            )
                            )
      Plaintiff,            )
                            )
vs.                         )       Civil Action No. CV-00-S-2373-S
                            )
BELLSOUTH TELECOMMUNICATIONS, )
INC.                        )
                            )
      Defendant.            )

ENTERED

OCT - 3 2000

MEMORANDUM OPINION

This is an action under the Employee Retirement Income
Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 — 1141.

Plaintiff, Ellen Henderson ("Henderson"), was an employee of
defendant, BellSouth Telecommunications, Inc. ("BellSouth"), for
seventeen years and eleven months.

On April 29, 1998, Henderson submitted to a surgical procedure
for total replacement of her right ankle with a prosthetic device.
That procedure was not successful. Henderson consequently was
forced to endure a painful, second surgical procedure for
replacement of a portion of the original prosthetic device on
November 5, 1999. Between the two major surgeries, Henderson
submitted to five additional operative procedures of varying
severity and intrusiveness. Twelve days before the last of her
surgeries, Henderson's husband died suddenly of a massive heart

attack.  Quite understandably, Henderson subsequently was treated for major depression.  During May of this year, she was admitted to a hospital for four days following an unsuccessful suicide attempt.

As if that were not enough, BellSouth fired Henderson on July 18, 2000 — an action it euphemistically refers to either as "removing an employee from the payroll,"[1] or as "separating an employee from the company."[2]  The stated reason for Henderson's termination was her "failure to return for work without adequate proof of total disability from work."[3]  During her employment with defendant, Henderson was a participant in the BellSouth Short Term Disability Plan ("STDP"), under the terms of which she was entitled to receive disability benefits if she was "disabled and ... unable to perform any type work as a result of a physical or mental illness or an accidental injury."[4]  This plan was funded by

---

[1] Plaintiff's Exhibit 4 (letter to Henderson from defendant's Network Manager dated July 10, 2000), at 3d ¶ ("If you do not report for work or provide new sufficient medical evidence as described above as to your alleged total disability, BellSouth will have no choice but to <u>remove your</u> [name] <u>from the payroll effective</u> 7-17-2000.") (emphasis added).

[2] Defendant's Exhibit 2 (Henderson's personnel record).

[3] *Id.* ("Separated employee, Ellen Henderson, from the company for failure to return for work without adequate proof of total disability from work, effective 7-18-2000.").

[4] Plaintiff's Exhibit 2 at 1, providing in pertinent part that:

You are entitled to receive STDP [Short Term Disability Plan] benefits if:

- You have attained six full months of net credited service, [and]

- You are disabled and an unable to perform any type work as a

BellSouth and administered by Kemper National Services, Inc.

The immediate issue before the court is whether Henderson is entitled to preliminary injunctive relief: specifically, ordering BellSouth to reinstate Henderson "to the payroll," and to cease all further efforts to interfere with her employment status while she appeals the denial of her claim for benefits under either the company's short-term and long-term disability plans,[5] or its pension plan.[6]

## I. FACTUAL BACKGROUND

In order to place the merits of Henderson's claims in proper context, it is necessary to detail more of her history than simply

---

result of a physical or mental illness or an accidental injury. Any type work includes your regular job with or without accommodations, any other participating company job (regardless of availability) with or without accommodations, or temporary modified duties.

[5] *See id.* at 5:

After you have received 52 weeks of the short-term disability benefits, if you continue to be disabled, you may be eligible for benefits under the company's Long Term Disability Plan for Salaried Employees or Log Term Disability Plan for Non-Salaried Employees, which are described in separate booklets.

*See also* Defendant's Exhibit 1 (copy of the August 9, 1998 collective bargaining agreement between the Communications Workers of America and BellSouth Telecommunications), Article 19, § 19.01, at 184-85.

[6] *See* Plaintiff's Exhibit 2 at 5:

You may also receive a pension under either the BellSouth Personal Retirement Account Pension Plan or the BellSouth Pension Plan if you continue to be totally disabled and have completed at least 15 years of net credited service when your 52-week [short-term disability] benefit period ends. Pensions for these plans are described in separate booklets.

the bare picture sketched with broad strokes in the introductory section of this opinion.  Indeed, it is necessary to summarize those facts of which BellSouth and its plan administrator had knowledge when making the decisions to deny Henderson's claim for short-term disability benefits and terminate her employment. Therefore, except as otherwise noted, the following statement of facts was culled almost exclusively from the evidentiary record, <u>particularly</u> the file produced by Kemper National Services, Inc. of Plantation, Florida ("Kemper"), one of the Kemper Insurance companies, and the administrator of BellSouth's STDP.[7]

## A.   Plaintiff's Personal and Family History

Ellen Henderson was born on April 14, 1942,[8] which makes her 58 years old on the date of this opinion.  Henderson originally injured her right ankle when she was about 16 years of age.  At the time, she was home alone:  her parents were out of town attending Mardi Gras.  There was a massive, 13 inch snowfall.  Henderson slipped, fell, and broke her right ankle.  She "recalls having to

---

[7] This court will reference such file materials through citation of the appropriate Bates-stamp designation (*i.e.*, "Kemper [number]") affixed to each document by defendant's attorneys.

Further, these are the "facts" for purposes of this opinion only, because they were the information upon which the defendant and its plan administrator based their decisions; they may not be the actual facts.  Cox v. Administrator U.S. Steel & Carnegie Pension Fund, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied sub nom* USX Corp. v. Cox, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995).

[8] *See* Kemper 27 & 36.

-4-

stay overnight at the site of the injury before being taken out on a stretcher formed by human arms and transported to the hospital for treatment."[9]  The break "was marked by poor healing and the need for the bone to be re-broken several months after the original episode.  [P]ins were installed and later removed."[10]  After that, "she was able to walk on her ankle well enough to get around, but suffered from gradually increasing pain over the years."[11]

Mrs. Henderson's "increasing pain over the years" has not been solely the product of her physical disabilities.  For example, her first marriage, which occurred on February 22, 1963, lasted only two years.  It produced Mrs. Henderson's only natural child, a daughter, but otherwise was "marked by domestic violence including physical abuse which caused her to miscarry" another child.[12]  When Mrs. Henderson's daughter was five years old, she married the man who was to remain her husband (and eventually her total care-giver) for most of the following thirty years.  The continuity of those three decades was broken, however, when Mrs. Henderson learned "that her husband had been having sexual intercourse with her 18

---

[9] Kemper 28 (page two of an eight page [Kemper pages 27 – 34] independent psychological evaluation performed for BellSouth on July 3, 2000, one week before plaintiff was fired, by Charles J. Whetsell, Ph.D.).

[10] *Id.*

[11] *Id.*

[12] Kemper 29.

year old daughter."[13]  That discovery produced a one year divorce
and Mrs. Henderson's first psychotherapy sessions.[14]  The harm
caused by that marital/family transgression rippled outward for
years.

> She notes that her daughter has been irresponsible and
> has had serious problems with alcoholism in the past.
> She also notes that her daughter's husband has threatened
> her and has refused to let her see their twin children
> until recently.  She notes that her son-in-law and
> daughter moved in with her in October, 1999, after her
> husband's death.  She states her son-in-law subsequently
> stole her credit card and maxed it out.  She states that
> she eventually made them move from her residence in
> February of this year.  She notes that her son-in law did
> not work during the period of time that he lived with
> her.  She states that he now has obtained and is
> retaining an excellent job, and has begun treatment at a
> Methadone clinic for his addiction to pain medications.
> She notes that he gives her paycheck to her.  She states
> that she now sees her grandchildren on a daily basis, as
> her daughter and son-in-law live on her property.  She
> also reports her daughter is no longer drinking.  Queried
> about these recent improvements in her family situation
> and their effect on her, Mrs. Henderson says "I couldn't
> grieve until February.  So much was going on with my
> family." [15]

In spite of all, Mrs. Henderson's husband spent the remaining
years of his life atoning for his sin.  Obviously he succeeded, at
least to some extent, because Mrs. Henderson reported to
BellSouth's independent psychological examiner that she suffered

---

[13] *Id.*

[14] Kemper 27.

[15] Kemper 29.

uncontrolled dysphoric affects at work, triggered by such events as a show of concern from coworkers or by memories of her deceased husband which are elicited by the work environment.  Ms. Henderson notes that her husband had not only driven her to work but had transported her inside the building to her desk via wheelchair during the time she was unable to walk due to ankle problems.  She states that she therefore finds the work setting emotionally distressing.[16]

.  .  .

[S]he became extremely dependent on her husband.  She cries during interview as she says "I couldn't let him out of my sight.  He was my arms and my legs."  ...[17]

.  .  .

[H]er husband then died October 24, 1999....  She describes him as having "done it all — the housekeeping, the cleaning.  He gave me a perm the day before he died."  She describes a traumatic death in which he called out her name just before she heard the sound of him hitting the floor.  She reports that he apparently died of a massive heart attack.[18]

.  .  .

She also reports having guilt about her husband's death, and articulates a belief that the extra work he performed while caring for her orthopedic difficulties somehow hastened or caused his death.  She also states that she will on occasion cry "all day long."  ...[19]

B.   **Plaintiff's Recent Medical & Psychological History**

After enduring years of gradually increasing ankle pain, Henderson underwent surgery to have her ankle replaced with a prosthetic joint on April 29, 1998.[20]  The ankle required several

---

[16] Kemper 27-28.

[17] Kemper 29.

[18] *Id.*

[19] Kemper 30-31.

[20] Kemper 8.  This is known as a total ankle anthroplasty.  *Id.*

more painful surgeries over the next two years.[21]  These procedures included: 1) the decrease in eschar of the anterior aspect of the ankle on June 5, 1998; 2) a plantar fascial release, Z-lengthening of the Achilles tendon, release of the posterior ankle and subtalar joint capsule, and a release of the flexor hallucis longus sheath at the fibrooseous tunnel on October 9, 1998; and 3) a refusion of the syndesmosis and placement of the tibiofibular syndesmosis screws on March 19, 1999.[22]  As previously noted, Mrs. Henderson's husband died suddenly on October 24, 1999, days before she underwent her most recent surgery.   On November 5, 1999, the surgeons carried out a revision of the talar component of her ankle.[23]  For this surgery, Henderson was hospitalized from November 5-8, 1999.

Henderson has, nevertheless, continued to experience pain in her ankle.   John S. Gould, her orthopaedic specialist, noted on January 3, 2000, that she could "begin weightbearing as tolerated. She will gradually wean herself from the ... walker."   Henderson was advised by Dr. Gould not to work "pending next appointment."[24] By January 27th, she had not significantly improved.[25]  By March 14,

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Kemper 16.

[25] Kemper 17.

2000, Henderson's ankle was improving, but she was still experiencing pain. Dr. Gould observed:

> regarding her work capacity the patient's capacity to walk is still extremely limited by pain and swelling as well as the necessity for use of external support and crutches. It is reasonable that the patient will be able to discontinue crutches and external support with time. As noted above medical objectives are to return her activity capacity and this may come with time.[26]

Dr. Gould noted in a letter on March 14, 2000 that "she has about another two months before she should be able to return to all activities."[27] Unfortunately, Henderson still did not improve. On May 1, 2000 Dr. Gould noted:

> She has enough pain so that she has to wear the short leg CAM Walker and she uses a single crutch but she says even with [not legible] she gets some pain in her foot and ankle. She says that she worked two days and was unable to work after that.
>
> ...[S]he is unable to work a normal day. She does not have other options at work and she continues to have to use ambulatory aid and support to eliminate pain.
>
> . . .
>
> ...[I]t would appear now that the appropriate next move for her is to be permanently retired for disability.[28]

Henderson's condition throughout her extended recovery period has been further exacerbated by psychological problems caused, in

---

[26] Kemper 19.

[27] Kemper 18.

[28] Kemper 8,9.

part, by the death of her husband.  When she tried to return to work after the surgery, she suffered "impaired concentration" and "uncontrolled crying."[29] For a period of time, Henderson was crying almost all day, every day.[30]  Her bouts of crying became less frequent over time, but she still cried on a daily basis.[31]  She has suffered from other symptoms as well.  Henderson lost 43 pounds between January of 2000 and July of 2000.[32]  She also has trouble sleeping, often sleeping only 2-3 hours per night.[33]  Most telling, however, is that Henderson has been plagued by suicidal thoughts.[34]

Dr. Charles J. Whetsell, Ph.D, performed an independent psychological evaluation of Henderson at the behest of BellSouth's plan administrator on July 3, 2000.  As previously observed, Mrs. Henderson told Dr. Whetsell that the work environment was upsetting to her, because it reminded her of her late husband, who had driven her to work and wheeled her to her desk in a wheelchair.[35]

Mrs. Henderson also described a significant history of psychiatric care.  She has engaged in psychotherapy during various

---

[29] Kemper 27.

[30] Kemper 28.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *See supra* text accompanying note 16 and Kemper 27-28.

stressful periods of her life.[36]   She also has been prescribed various psychotropic medications, including Prozac, Paxil, and Buspar.[37]  Henderson discontinued psychotherapy for a time, because she was unwilling to sign a no-suicide contract upon which her psychotherapist conditioned further treatment.[38]   Subsequently, Henderson was admitted to Brookwood Hospital for treatment of depression marked by suicidal ideation.[39]  She then began taking the anti-depressant drug Zoloft.[40]  She also began seeing a different psychotherapist.[41]

Dr. Whetsell performed a series of tests on Henderson, the results of which were consistent with depression and chronic pain. He noted:  "Her profile is consistent with that of a chronic pain patient ... [and] also suggests she is suffering from moderate levels of depression and anxiety, compounded by feeling alienated from others."[42]  The test indicated:  "There is some suggestion she may suffer from occasional and brief decrements in performance associated with fluctuating levels of concentration and

---

[36] Kemper 27.

[37] Id.

[38] Kemper 28.

[39] Id.

[40] Id.

[41] Id.

[42] Kemper 33.

-11-

attention."[43]  Dr. Whetsell described the test results:

> The implication is that Ms. Henderson is presently
> suffering some impairments in attention to visual
> stimuli, which also causes her to have impairments in
> long term memory of visual material.  The reader should
> note these impairments are ... suggestive of some process
> which is disrupting her relative ability to attend to and
> retain material presented in the visual mode.[[44]]

Dr. Whetsell observed Henderson's behavior during test administration.  He noted that she "displayed somewhat variable attention," and that "[o]n several occasions, she appeared to forget that she had been asked to perform a task."[45]  Henderson also "appeared to lose track of the question that had just been asked."[46]  Furthermore, she "presented quite confused" during the evaluation.[47]

Dr. Whetsell filled out a Psychiatric Functional Capacity Examination form regarding Henderson on July 23, 2000.  First, Whetsell found impairments in Mrs. Henderson's cognitive functioning.  He noted that her IQ scores were consistent with her education and occupational attainment, but her ability to concentrate and to pay attention were not consistent with her IQ.[48]  He also noted that she demonstrated "slow pacing" during the IQ

---

[43] Kemper 32.

[44] Kemper 33.

[45] Kemper 31.

[46] *Id.*

[47] Kemper 32.

[48] Kemper 36.

tests.[49]   Dr. Whetsell determined that Henderson did not have a problem with emotional and behavioral control, but he noted that she cried on numerous occasions during the evaluation.[50]

## C.   Plaintiff's Last Job Position at BellSouth

Henderson had been working as a service representative for BellSouth when her medical problems began.  This position requires frequent interaction with people.  She orders services from independent long distance carriers, talks to corporate clients, and helps them troubleshoot.  She described the position to Dr. Whetsell as "an intense job with many codes."[51]  She had planned to retrain in her position upon returning to work to refresh her recall of the codes and other procedures.[52]  She also told Dr. Whetsell that she had enjoyed the challenge of her position prior to taking leave in November of 1999.[53]

## D.   History of This Claim for Benefits

The provisions of the STDP are set out in "The ... Summary Plan Description," revised October 1, 1996.  All BellSouth employees who are not temporary are "participants" in the STDP.[54]

---

[49] Kemper 37.
[50] *Id.*
[51] Kemper 30.
[52] *Id.*
[53] *Id.*
[54] BellSouth Short Term Disability Plan, Plaintiff's Ex. 2 at 1.

Employees are eligible to receive STDP benefits if they: 1) "have attained six full months of net credited service;" and 2) "are disabled and are unable to perform any type work as a result of a physical or mental illness or an accidental injury."[55] "Any type work" is defined as "your regular job with or without accommodations, any other participating company job (regardless of availability) with or without accommodations, or temporary modified duties."[56]

The amount of benefits available to a participant depends on that participant's length of service to BellSouth.  Because she had been working for BellSouth for almost eighteen years, Henderson is eligible under the STDP for up to twenty-six weeks of full pay and for up to twenty-six weeks of half pay.[57]

A participant claiming benefits under the STDP is directed to satisfy six prerequisites:

> Report the disability to your supervisor on the first day of your absence;

> Take proper care of yourself and obtain appropriate professional care;

> As required by the STDP representative, furnish satisfactory evidence of your disability;

---

[55] *Id.*

[56] *Id.*

[57] *Id.* at 2.

Provide all necessary and appropriate information regarding your condition;

Permit examination by a physician or other health care provider designated by the Plan administrators, when requested;

Contact your STDP Representative to obtain permission if you plan to recuperate away from you home.[58]

The STDP also imposes limits on the benefits, which are not payable:

For periods of time during which you receive wages from the company;

For periods of time when your medical condition (either temporarily or permanently) prevents you from performing the duties of your regular job but you are not medically restricted from performing other work;

If your employment is terminated ....[59]

Despite having knowledge of the facts surrounding Mrs. Henderson's absence from work, which were taken directly from their files, Kemper repeatedly denied that Henderson was entitled to short term disability benefits.

Dr. Gould transmitted a facsimile message to Kemper representative Joyce Weinstein releasing Henderson to work "light duty," but "for half days only," on April 11, 2000.[60] He also observed that: "She will also require assistance getting from the

---

[58] *Id.* at 4.

[59] *Id.*

[60] Kemper 21.

parking garage to the office building."[61]   An unidentified Kemper claims examiner left a voice mail message for Henderson on April 13th, informing her that Dr. Gould's restriction that she was work "for half days only" was not approved, "as no medical data"[62] had been provided by Dr. Gould "to substantiate half days."[63] Henderson spoke personally with a Kemper claims examiner the next day.  That claims examiner reiterated that half-days were not approved, as "no objective medical data to substantiate" the restriction had been provided.[64]   Henderson was warned to return to work or suffer the consequences of failing to do so:  "Advised if patient does not RTW [return to work] to process for denial."[65]

Henderson returned to work on April 24th and 25th.  As a result, however, she suffered increased pain in her feet, and subsequently continued to be absent from work.[66]

Kemper received a fax message from Dr. Gould on May 4, 2000, transmitting copies of his office notes, dictated following his examination of Henderson on May 1st.  Dr. Gould observed:

[S]he is unable to work a normal day.  She does not have

---

[61] Kemper 21.
[62] Kemper 61.
[63] Kemper 59.
[64] Kemper 63.
[65] Kemper 63.
[66] Kemper 28.

other options at work and she continues to have to use ambulatory aid and support to eliminate pain....

... It would appear now that the appropriate next move for her is to be permanently retired for disability.[67]

Kemper received additional substantiation of Henderson's disability on May 19, 2000, from clinical psychologist Joel D. Melvin, Ph.D, stating in substance that Henderson "has been diagnosed with Major Depressive Episode, Severe (296.23)."[68]

Even so, Henderson received a letter from Kemper on May 22, 2000, stating:

Upon review of your file, it has been determined that you no longer qualify for Short-Term Disability benefits. Pursuant to BellSouth's Short Term Disability Plan, Section 2, objective data that supports your inability to perform any type work must be obtained in order to be eligible for benefits. On 5/9/00, I confirmed with your employer you relapsed out of work on 4/21/00, after taking vacation effective 4/17/00, and then again relapsed on 4/26/00, after returning to work on 4/24/00. On 5/1/00, you were coded MP by BellSouth. To date I have not received any medical data to substantiate a disability from any type of work during the relapse periods of 4/21/00-4/23/00, 4/26/00-4/27/00, 5/2/00 forward. Therefore, your benefits are denied for these time periods.[69]

Henderson received another letter from Kemper the same day, confirming the denial of benefits, and requiring her to return to work:

---

[67] Kemper 8-9.

[68] Kemper 3.

[69] Kemper 4.

-17-

This is to confirm our recent discussion regarding payment of Short-Term Disability benefits. Please note that your absence effective (4/21/00-4/23/00 AND 4/26/00-4/27/00 AND 5/2/00), does not qualify for payment under the Short Term Disability Plan, as the medical information you and/or your physician provided does not support a disabling condition that would prevent you from performing any type of work. Should you require modified job duty for return to work, it is your responsibility to contact your Physician to obtain the specific restrictions.  <u>If provided, the restrictions will be evaluated by me for medical necessity.</u>

Since your absence is without medical certification, you should contact you supervisor regarding your intentions for returning to work.[70]

Kemper partially reinstated Henderson's short-term disability benefits on May 25, 2000.  A letter to Henderson explained:  "We have reviewed all the additional information received concerning your Short-Term Disability claim.  We will be reinstating your Short-Term Disability benefits as of (<u>5/9/00 through 5/12/000</u>)."[71]

Kemper received more evidence of Henderson's medical problems on June 16, 2000.  Dr. Melvin, Henderson's clinical psychologist, sent a fax to Kemper noting four severe impairments and three moderate impairments of Henderson's mental status.[72]  He pointedly noted:  "Patient is not released to work."[73]

Nevertheless, Kemper continued to deny Henderson's entitlement

---

[70] Kemper 6 (emphasis supplied).

[71] Kemper 21 (emphasis in original).

[72] Kemper 23-24.

[73] Kemper 24.

-18-

to benefits.    Kemper's letter to Henderson of June 21, 2000, stated:

> We have reviewed the recent medical information received from Dr. (Melvin) on (6/20/00).  However, our decision to deny Short Term Disability benefits, which was rendered on (5/22/00) remains unchanged.
>
> Please remember that you have sixty (60) days from the date of your **original** denial letter to request a formal appeal in writing.[74]

Kemper denied benefits to Henderson even after reviewing Dr. Whetsell's extensive Psychiatric Functional Capacity Examination and Mental Disorders Fitness for Duty Report, which Kemper received on June 28, 2000, and July 5, 2000, respectively.[75]  She received a letter from BellSouth July 10, 2000, ordering her to return to work:

> I have been advised by our Benefit Administrator, Kemper National Services, that you have not been certified for Short Term Disability benefits beginning 5-13-2000 because medical information submitted does not substantiate total disability from work.  Therefore, you are expected to return to work on or before 7-17-2000.
>
> Should you not report to work for medical reasons, please be advised that it is your responsibility to provide to the satisfaction of the Company's Benefit Administrator proof of disability as specified in the Company's Benefit Plan ... Please note that Kemper has already reviewed all medical information submitted to date, and has determined that it does not substantiate total disability from work.

---

[74] Kemper 25 (emphasis in original).

[75] *See* Kemper 26, 35.

> If you do not report for work or provide new sufficient medical evidence as described above as to your alleged total disability, <u>BellSouth will have no choice but to remove your [sic] from the payroll</u> effective 7-17-2000.[76]

Henderson's attorney sent a letter to Kemper on July 13, 2000, requesting reconsideration. He stated:

> Ellen Henderson appeals the denial of benefits conveyed in you letter dated May 22, 2000. Her diagnosis of Major Depressive Episode, Severe is disabling.

> Please reconsider the denial communicated on your letter of May 22, 2000 and award benefits due under the policy.[77]

Soon thereafter, however, BellSouth terminated Henderson's employment "for failure to return to work without adequate proof of total disability from work, effective 7-18-2000."[78]  This action followed.

## II. DISCUSSION

To justify the entry of a preliminary injunction, plaintiff must satisfy four prerequisites:  (1) demonstrate a substantial likelihood of ultimately prevailing on the merits; (2) show she will suffer irreparable harm if an injunction maintaining the status quo *pendente lite* does not issue; (3) prove that the threatened injury to plaintiff outweighs whatever damage the

---

[76] Plaintiff's Ex. 4 (emphasis supplied).

[77] Kemper 1.

[78] Defendant's Ex. 2.

proposed injunction may cause the opposing parties; and (4) demonstrate that the injunction will not be adverse to the public interest. *See, e.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville, Florida*, 896 F.2d 1283, 1284 (11th Cir. 1990); *see generally* 11A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2948, at 131-33 (2d ed. 1995). Each of these factors is discussed in the following sections.

### A.   Likelihood of Success on the Merits

A party seeking preliminary injunctive relief must first demonstrate a substantial likelihood of ultimately prevailing on the merits. This does not mean that the movant must show she is certain to succeed on the merits. *See Johnson v. United States Department of Agriculture*, 734 F.2d 774, 782 (11th Cir. 1984); 11A Wright, Miller & Kane, *supra* § 2948.3, at 188 & n.5. Rather, the movant simply must show a "likelihood" of success, because of the rationale underlying both temporary restraining orders and preliminary injunctions:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if

> those positions are to be preserved, a preliminary
> injunction is customarily granted on the basis of
> procedures that are less formal and evidence that is less
> complete than in a trial on the merits. A party thus is
> not required to prove his case in full at a preliminary-
> injunction hearing, ... and the findings of fact and
> conclusions of law made by a court granting a preliminary
> injunction are not binding at trial on the merits.

*University of Texas v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct.

1830, 1833, 68 L.Ed.2d 175 (1981).

The issue here is not whether Henderson is entitled to

benefits. It is, rather, whether she is substantially likely to

succeed on the merits of her claim that defendant fired her for the

purpose of interfering with her right to receive disability

benefits. As discussed below, the court determines that Henderson

is substantially likely to prevail on her claims pursuant to

Section 510 of the Employee Retirement Income Security Act of 1974.

### 1.   Section 510 of ERISA, 29 U.S.C. § 1140

ERISA section 510 provides, in pertinent part, that:

> It shall be unlawful for any person to discharge, fine,
> suspend, expel, discipline, or discriminate against a
> participant or beneficiary for exercising any right to
> which he is entitled under the provisions of an employee
> benefit plan, this subchapter, section 1201 of this title
> ... or for the purpose of interfering with the attainment
> of any right to which such participant may become
> entitled under the plan....

49 U.S.C. § 1140.

An employer may discharge an employee for excessive

-22-

absenteeism after determining in good-faith that the employee is not disabled.  *See Godfrey v. Bellsouth Telecommunications, Inc.*, 89 F.3d 755, 759 (11th Cir. 1996).  The employer does not violate ERISA Section 510 by making an erroneous good-faith determination. *See id*.  Nevertheless it is improper under ERISA to terminate an employee for the purpose of interfering with her right to receive benefits.  *Id*.

Defendant argues that Henderson is not likely to succeed on the merits of her claim because she has not proved that defendant acted in bad faith.  Defendant asserts that it merely relied upon Kemper's determination that Henderson was not disabled.  Defendant substantiates this assertion with a quote from the controlling case, *Godfrey v. BellSouth Telecommunications, Inc.*:

> Of course an employer may demand that an employee return to work after determining that the employee is not disabled, and then discipline that employee for unexcused absences.  The employer does not violate ERISA § 1140 just because a court later determines that the employer's good faith disability determination was wrong. [79]

Defendant neglected, however, to quote the next sentence, which states:  "However, ERISA Section 510 <u>does</u> prohibit an employer from threatening to fire a disabled employee in order for the employer

---

[79] Defendant's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction (doc. no. 11) at 5 (quoting Godfrey v. BellSouth Telecommunications, Inc., 89 F.3d 755, 759 (11th Cir. 1996)).

to avoid paying further benefits." *Godfrey*, 89 F.3d at 759 (emphasis added).

In *Godfrey v. BellSouth Telecommunications, Inc.*, No. CV-94-C-1386-S (N.D. Ala. May 9, 1995), the district court found that BellSouth violated section 510 of ERISA when it denied plaintiff's disability claims and subsequently fired her.   At that time, BellSouth funded <u>and</u> administered the plan.   The plaintiff was suffering from painful muscle disorder fibromyalgia, which required her to take numerous medications to inhibit the pain.   She had submitted several reports from various physicians to the defendant as evidence of her disability.[80]   The district court found that BellSouth had wrongfully denied benefits, noting:

> It seems to the court that the only rational explanation for the failure of the defendant's physicians to follow up on the evidence which they did have and to ignore the effects of the medications that the plaintiff was taking is that they knew that in fact plaintiff was disabled and following up the leads and considering the effect of the medications would only confirm what any reasonable doctor would already have known. [81]

Furthermore, the court found that the defendant had acted in bad faith, holding:

> The court finds and concludes that one of the reasons

---

[80] Transcript of Jury Trial before Honorable U. W. Clemon, United States District Judge at 279, Godfrey v. BellSouth Telecommunications, Inc., No. CV-94-C-1386-S (N.D. Ala. May 9, 1995).

[81] *Id.* at 281.

-24-

which influenced the defendant's decision to require the plaintiff to come to work was the consideration that she could not qualify for long-term disability benefits if in fact she was still physically present on the job and remained on the payroll as an employee of the company.[82]

BellSouth appealed to the Eleventh Circuit, which affirmed. The appellate court found that BellSouth had arbitrarily and capriciously denied benefits. *Godfrey*, 89 F.3d at 758. The court further held that BellSouth's actions violated ERISA Section 510:

> In this case, the District court specifically found: that BST [BellSouth Telecommunications, Inc.] threatened to discharge Godfrey if she stayed home and disciplined her when she did stay home, even though she had the right to stay home under the benefit plans; that BST did so, at least in part, in order to prevent Godfrey from becoming eligible for further benefits; and that from January 21, 1991 until October 1, 1993, Godfrey was disabled and BST unlawfully acted to prevent her from obtaining benefits under the SAD [Sickness and Accident Disability] plan and from becoming eligible for benefits under the LTD [Long-Term Disability] plan. The record fully supports these findings.

*Id.* at 759.

This court also finds, according to the standards elucidated in *Godfrey*, that Henderson has demonstrated a substantial likelihood of proving that BellSouth has in bad faith interfered with her right to receive disability benefits. This bad faith can be inferred from BellSouth's conduct and from its conflict of

---

[82] *Id.* at 282-283.

interest.

BellSouth's conduct proves its motivation.  Henderson had a right to stay home while she was disabled.  She was repeatedly ordered to return to work by Kemper, despite Kemper's knowledge of numerous physician's reports directing Henderson to stay home. While appealing this determination, Henderson was summarily discharged from employment by BellSouth.  BellSouth has offered no evidence that Henderson was fired for reasons other than her disability.  BellSouth's own Personnel Record Current Entry Sheet gives the reason for Henderson's discharge, stating:  "Separated employee, Ellen Henderson, from the company for failure to return for work without adequate proof of total disability from work."[83]

BellSouth also has a significant financial interest in firing Henderson to prevent her from obtaining benefits under the STDP. Henderson can recover STDP benefits only if she is on BellSouth's employee payroll.  BellSouth saves money by firing her because BellSouth funds the plan.  Furthermore, Henderson will become eligible for Long Term Disability benefits after she exhausts the fifty-two week limit on the STDP.

### 2.    Exhaustion of Administrative Remedies

BellSouth also argues that Henderson has failed to exhaust her

---

[83] Defendant's Ex. 2.

administrative remedies because she has not exhausted her STDP appeal rights.  This begs the question.  It is true that Henderson must exhaust her administrative remedies before bringing an action in federal court to enforce the provisions of the plan, but her right to appeal administratively is the very right that BellSouth has attempted to eliminate by firing her.  This tactic must fail. Henderson is not appealing the administrator's determination that she is not disabled.  She is not seeking benefits under or according to the STDP.  Henderson is trying to prevent BellSouth from unlawfully interfering with her appeal.

### B.   Irreparable Harm

Once the likelihood of success on the merits is established, the party seeking a preliminary injunction must demonstrate imminent, irreparable harm.  Some cases have described a showing of "irreparable harm" as "the *sine qua non* of injunctive relief." *Northeastern Florida Chapter of Ass'n of general Contractors of America v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)).

> The injury must be neither remote nor speculative, but actual and imminent. ... An injury is "irreparable" only if it cannot be undone through monetary remedies.  The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time

and energy necessarily expended in the absence of a stay
are not enough. The possibility that adequate
compensatory or other corrective relief will be available
at a later date, in the ordinary course of litigation,
weighs heavily against a claim of irreparable harm....

*Id.* at 1285 (citations and internal quotation marks omitted).

Here, Henderson has certainly demonstrated imminent,
irreparable harm. She cannot return to work because she is
disabled. If she does return to work, she will jeopardize her
entitlement to Social Security benefits and her ability to appeal
Kemper's determination that she is not disabled. Moreover, if
Henderson is fired from her job her appeal will be nearly moot
because she will lose her health insurance and will no longer be
entitled to Short Term Disability benefits under the plan.

### C.   Balancing the Harm

If a party establishes the likelihood of success on the merits
and imminent, irreparable harm, the court must weigh the harm that
will occur to the moving party, absent preliminary injunctive
relief, against the harm an injunction will inflict upon the
enjoined party. The focus at this stage of analysis is on the harm
that may occur between the issuance of a preliminary injunction and
a final hearing on the merits. *See United States v. Lambert*, 695
F.2d 536, 539 (11th Cir. 1983). BellSouth will not be harmed in
any way by maintaining the status quo of Henderson's employment

-28-

pending her exhaustion of the remedies provided by the Short Term Disability plan.

**4.    Injunction is not Adverse to the Public Interest**

The public interest will not be disadvantaged by the granting on a preliminary injunction to prevent defendant from terminating Henderson's employment.

### III. CONCLUSION

The court accordingly finds that plaintiff's motion for preliminary injunctive relief is due to be granted.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this the **3rd** day of October, 2000.

_____
United States District Judge

-29-